THE PEOPLE OF THE STATE OF NEW YORK EX REL.
GEORGE H. SISCO, APPELLANT, v. THE BOARD OF
COMMISSIONERS OF PILOTS, RESPONDENT.

*Pilots — the regulation of, is left by congress to the different States — Chapter 467 of
1853, as amended by chapter 196 of 1854 — power of board of pilots created by —
the board may prohibit the use of steam vessels for the purpose of pilotage.*

Under the act of congress of August 7, 1789, providing that all pilots in the bays
and harbors of the United States shall continue to be regulated in conformity
with the laws of the several States then existing, or which such States might
thereafter enact, the legislature of this State has the power to create a board
of pilots and refer to it the determination of the qualifications of pilots and of
the suitability and qualifications of the vessels to be employed by them.

Under section 9 of chapter 467 of 1853, as amended by section 1 of chapter 196
of 1854, the Board of Commissioners of Pilots thereby created have power to
prescribe the kind of boats to be used by pilots, and may exclude steam vessels
from being used for that purpose and suspend or revoke the license of any pilot
using a steamboat in the pilotage service.

APPEAL from a judgment entered upon a trial had at Special
Term dismissing a writ of prohibition.

By an act of the congress of the United States, approved August
7, 1789, it was provided "that all pilots in the bays, inlets, rivers,
harbors and ports of the United States shall continue to be regu-
lated in conformity with the existing laws of the States, respectively,
wherein such pilots may be, or with such laws as the States may,
respectively, hereafter enact for that purpose until further legislative
provision shall be made by congress."

In June, 1853, the State of New York enacted a law (chap. 467
of 1853) entitled "An act to provide for the licensing and govern-
ment of and regulating pilotage in the port of New York," which
last-mentioned act, as amended by the several acts amendatory
thereof, and particularly chapter 196 of 1854, was, at the time of
the issuing of the writ of prohibition in this proceeding, and is now
in full force, and the defendants herein are the Board of Commis-
sioners of Pilots provided for in the said act. The only sections
of this act which relate to the question raised upon this proceeding
are as follows:

" SEC. 9. The commissioners, or a majority of them, shall,

with all convenient speed, proceed to license for such term as they may think proper so many pilots as they may deem necessary for the port of New York."      *      *      *      *

" No license shall be granted to any person holding any license or authority from or under the authority or laws of any other State; and the said commissioners, or a majority of them, shall have the power and authority to revoke and annul the license of any person so licensed by them to act as a pilot who shall not be attached to a boat approved of by said board, or who shall be guilty of any intoxication or other misconduct while on duty."

" Sec. 12. The said commissioners shall have the power to regulate the stationing of pilot boats for the purpose of receiving pilots from outward-bound vessels, and may alter or amend any existing regulations for pilots, and make and duly promulgate and enforce new rules or regulations not inconsistent with the laws of this State or of the United States, which shall be binding and effectual upon all pilots licensed by them and upon all parties employing such pilots.  *  *  *  They may declare and impose and collect fines and penalties  *  *  *  to prevent any of the pilots licensed by them from combining injuriously with each other or with other persons,  *  *  *  and the said commissioners may establish and enforce all other needful rules and regulations for the conduct and government of the pilots licensed by them and the parties employing them."  *  *  *

Under the powers conferred by the act the commissioners duly made and promulgated from time to time certain by-laws, among which are the following:

" 32d. No boat shall withdraw from service (except for ordinary repairs) without a written application to the board explaining the object of the withdrawal, the same to be subject to the decision of the board."

" 39th. From and after the adoption of this by-law the number of boats employed in the pilotage service of the port of New York, by the way of Sandy Hook, shall not be increased without the consent of the board, nor shall any boats not now so employed be employed in said service without such consent."

In the year 1879 the relator was a duly licensed Sandy Hook pilot, and attached to pilot boat No. 10.

PEOPLE ex rel. SISCO *v.* COM'RS OF PILOTS.     605

First Department, January Term, 1881.

On the 20th of May, 1879, the relator applied to the defendants for permission to build a steam pilot boat, to which the defendants replied that his application was denied, there being no vacancy in the number of boats as fixed by law.

On the 12th of August, 1879, one Ralph Noble, also attached to pilot boat No. 10, asked permission on behalf of himself and the boat's company to transfer the No. 10 to some other boat.

The commissioners thereupon gave permission to replace pilot boat No. 10 by some other boat, retaining the same number.

The defendants having learned of the purpose of the relator and his associates to introduce a steam pilot boat, sent the following communication to the relator and his associates :

OFFICE OF THE BOARD OF COMMISSIONERS OF PILOTS,
No. 40 BURLING SLIP,
NEW YORK, *September* 2, 1879.

R. NOBLE *and others, pilots attached to the pilot boat "Widgeon" :*

GENTLEMEN.— A report that you are about to place a steam vessel in the pilot service of this port, and an application from certain of the New York pilots for action by this board adverse to the admission of a steamer into said service having been received this day, I am directed by the board to call upon you to state your intention in this respect, and to show cause, if any exist, why such adverse action should not be taken.

Yours respectfully,

D. A. NASH,
*Secretary.*

To this the relator and his associates sent the following reply on September 9, 1879 :

*To the Board of Commissioners of Pilots of the Port of New York :*

GENTLEMEN.— In reply to the order to show cause, etc., of the second inst., on the part of myself and company of pilot boat Widgeon, No. 10, I would respectfully state that it is our intention and desire to build or purchase a steamboat to replace the pilot boat Widgeon, No. 10, for our own convenience and for the benefit of the commerce of the port of New York. Our reasons for desiring to replace our present sailboat by a steamboat are :

1st. At times we have found it impossible to reach vessels by sail. This can be obviated by the use of a steamboat.

2d. It is frequently difficult in winter to return to port with a sailboat, in consequence of ice and adverse winds. This difficulty will be overcome by the use of steam.

3d. In winter it is frequently impossible to leave port with a sailboat, in consequence of ice and adverse winds. With steam no such difficulty would be experienced.

4th. In calm weather it is often very difficult to get in or out of port, or to reach and serve incoming vessels with a sailboat. With steam this would never occur.

5th. The use of steam is permitted, and has proven highly advantageous to New Orleans and elsewhere. Why should it not be permitted in New York?

6th. We are now frequently compelled to hire tugs to bring us in and out of port. If we are allowed to pay for the use of steam power, why should we be prohibited from owning it?

7th. The "Widgeon" is unseaworthy, and has so been pronounced by competent inspectors. If we can replace her by an able steamboat at a price which in our judgment would prove profitable, why should we be prohibited from so doing?

Respectfully,

RALPH NOBLE.

*For self and company of pilot boat No.* 10.

Dated NEW YORK, *September* 8, 1879.

The relator and his associates, about November 1, 1879, having had no further communication with the respondents, secured the steamboat "Hercules," transferred the number 10 to her, and were preparing to get her ready for sea.

On November 7, 1879, the respondents passed the following resolution:

42d. Until it shall be established, in the opinion and judgment of this board, that the introduction of steam into the pilotage service will add to its general efficiency, and can be made with a proper regard to the interests already existing, which have been created under the present law, and until this board shall, by general regulation duly made and promulgated in the exercise of the discretion

PEOPLE ex rel. SISCO v. COM'RS OF PILOTS.    607

First Department, January Term, 1881.

and power vested in it, authorize the use of steam vessels in the pilotage service, no vessel propelled in whole or part by steam shall be substituted for any boat withdrawn from service, nor shall any vessel propelled in whole or in part by steam be used or employed as a pilot boat by any of the pilots; and any pilot violating this rule shall be punishable by suspension for such period as the board shall determine, or by a revocation of his license.

The relator and his associates never applied to the defendants for their approval of the steamboat Hercules as a pilot boat, but without such approval commenced the pilotage service. Complaint having been made of a violation of by-laws Nos. 39, 41 and 42, the relator was notified by the respondents to attend before them on the twenty-fifth day of November, when a hearing and determination would be had by the board of the matters complained of.

The relator thereupon obtained the writ of prohibition now before the court, upon an appeal from the order dismissing it.

The following opinion was delivered by the court at Special Term:

"Van Brunt, J.:

"There are only two questions to be discussed in the disposition of this case: First. Had the respondents the power to pass the by-laws in question? Second. Had the board the right to proceed against the relator because of the use of a steamboat, the same not having been approved by the board as a pilot boat? It is not at all necessary here to discuss the nature and office of a writ of prohibition. If the Board of Commissioners of Pilots had jurisdiction to act, then this writ must be dismissed. It is only when action without jurisdiction is about to be taken that writs of prohibition can issue.

"It is claimed by the relator that the commissioners had no power to pass by-law 42, upon the ground that congress nowhere empowered the States to prevent the introduction of steam into the pilot service.

"It is not so much what congress has empowered the States to do, as the fact that congress has not legislated at all upon the subject, that gives the State, as part of the police regulation of its ports, the right to establish pilotage service. It is true that by the

act of 1789, congress has treated of the pilotage service, but this legislation was nothing but a notice to the States that, for the present at least, all questions of pilotage should be left to the States until congress should choose to legislate upon the subject itself. The same condition of things exists as to the quarantine establishments. As long as congress does not take the subject into its hands, the State can protect itself by suitable legislation. The State, therefore, has absolute control of the subject. They may maintain a compulsory pilotage service, or they may abolish it altogether. It has been frequently held that the States may compel incoming vessels to pay pilotage, and regulate the fees for pilotage. Whenever the States in the judgment of congress abuse the power which has been not confided to but permitted to remain with them, it can legislate upon the subject and take full control of all matters relating to it; and until congress does this, the power of the States is unlimited, except by its own Constitution and laws. It is urged that if congress did intend to intrust this enormous power to the State legislatures, there was not thereby conferred upon them any right to delegate it to a local irresponsible board. In the disposition of the question at bar, it is not at all necessary to discuss whether the act in question is a local one or not, or whether the legislature has delegated any legislative power to the defendants or not. These questions are interesting ones, and when the necessity arises they may perhaps be discussed with interest and profit, but such a digression would be out of place here. That legislatures have the power to appoint boards, who shall determine the fitness of persons for a particular vocation, and the fitness of things for the uses to which they may be intended, cannot now be questioned. The admission to the bar is regulated in this way. The qualifications of engineers to follow their calling is ascertained in this way. The right to the use of steam boilers is also similarly regulated, and I might instance numbers of like cases.

"The legislature, then, had the right to refer to a board the determination of the qualifications of pilots, and they had also the right to refer to a board the determination of the suitability of the vessels used by pilots in the exercise of their vocation. These things have been expressly done by section 9 of the State act. It reads: 'The commissioners, or a majority of them shall, with all

convenient speed, proceed to license, for such term as they may think proper, so many pilots as they may deem necessary for the port of New York; and such commissioners may specify in such licenses different degrees of qualifications appropriate to different parts or branches of duty, according to the competency of the applicants.' This constitutes the board an examining board and a licensing board, giving them a discretion as to number. Then follows a clause excluding pilots holding license from any other State. The section then proceeds: 'And the said commissioners, or a majority of them, shall have power either to revoke and annul the license of any person so licensed by them to act as a pilot who shall not be attached to a boat approved by said board.' This clause clearly gives the commissioners the power to determine the qualifications of boats for the duty as well as those of the men themselves. If the legislature could confide the one question to a board, they could also entrust the other. The cases are too numerous in which such power has been exercised, some few of which have been noted above, that it cannot now be questioned. The result of this provision of the statute is, that a pilot cannot introduce into the pilotage service a boat which is not approved of by the board. It may be urged that it was not the custom of the commissioners to examine and approve of the boats admitted to the fleet. This is undoubtedly true, but the non-user of the power of approval did not repeal the provision of the statute or take away from the board a power expressly conferred upon it. They may not have deemed it necessary to inflict the penalty provided by the statute before; but when, in their judgment, the interests of the service committed to their care require it, they can use the power conferred upon them. The matter is left by the statute wholly in their discretion. No boat could, therefore, become a pilot boat without the consent of the commissioners, expressed or implied. There can be no implied consent made out in the case at bar, as the commissioners had in no way recognized the Hercules as a pilot boat. The permission given to the company of pilot boat No. 10 to replace that by another boat, was clearly not a waiver of the right of the commissioners to disapprove of the boat sought to be introduced. As to by-law No. 42, it is of no consequence in this case whether it be considered a by-law

610    PEOPLE ex rel. SISCO v. COM'RS OF PILOTS.

FIRST DEPARTMENT, JANUARY TERM, 1881.

or not. It was a notice to the pilots that the board would not allow any steamboat to be introduced into the fleet; and, as we have seen, the board had the power to exact their approval as a condition precedent to the admission of any boat into the fleet, no by-law was necessary to enable them to execute the penalty prescribed by the law. The Hercules, never having been either approved of or recognized in any way by the commissioners, never was a pilot boat; and boarding vessels by the relators from her was a breach of by-law No. 41, if any other pilot boat was in sight. The complaints in this case made to the commissioners allege a breach of this by-law, giving the full particulars. The board of commissioners had the right to try the question (there being no question raised as to their power to pass by-law No. 41, it is unnecessary for me to consider the proposition) as to whether or not the relator had been guilty of a violation of this by-law, and this court cannot take that office out of their hands. In discussing these questions, I have not adverted to section 12 of the law, not because I do not think that the power to pass by-law No. 42 is not thereby conferred, but because it seemed to me that there could be no question but that under section 10, the board has the power to exclude steam vessels from the fleet of pilot boats, and this seems to be the question raised by the proceeding. There must be judgment for the respondents, dismissing the writ."

*Thomas Bracken,* for the the appellant. Congress did not intend to authorize the State legislature to delegate the power conferred upon it to a local irresponsible board. (*Thorne* v. *Creamer,* 15 Barb., 112; *Bradley* v. *Baxter,* id., 122; *Barto* v. *Himrod,* 8 N. Y., 483; *Healey* v. *Dudley,* 5 Lans., 115; *Clark* v. *City of Rochester,* 28 N. Y., 605; *Bank of Rome* v. *Village of Rome,* 18 id., 38; *Starin* v. *Town of Genoa,* 23 id., 456; *Coe* v. *Schultz,* 47 Barb., 64.) The legislature cannot delegate legislation to the people. (*Rice* v. *Foster,* 4 Harr., 479; *Geebirck* v. *State,* 5 Iowa, 491; *Santo* v. *State,* 2 id., 165; *State* v. *Beneke,* 9 id., 203; *State* v. *Copeland,* 3 R. I., 33; *People* v. *Collins,* 3 Mich., 343.) *Vide* as to what is a local law. (*Healey* v. *Dudley,* 5 Lans., 115.) If the legislature had the power to delegate the right to legislate, or in other words to create a legislative body, no unlimited, arbitrary or absolute power would thereby be conferred upon the commissioners.

(*Commonwealth* v. *St. Patrick's Society*, 2 Binn., 441 ; *The People ex rel. Thatcher* v. *New York Commercial Association*, 18 Abb. Pr., 271 ; *The People ex rel. Gray* v. *The Medical Society of Erie*, 24 Barb., 570 ; *Gosling* v. *Veley*, 12 Q. B., 347 ; *The People ex rel. Schmidt* v. *S. F. F. Society*, 24 How. Pr., 216 ; *People ex rel. etc.*, v. *N. Y. Cotton Exchange*, 8 Hun, 216 ; Angell on Corporations, §§ 268, 347, 349 ; 2 Kent's Com., 297–9 ; Grant on Corporations, 263, 264.)

*William Allen Butler*, for the respondent.

Per Curiam :

We think this case was correctly decided by the Special Term, and that the judgment should be affirmed substantially upon the opinion of Van Brunt, J.

We may add that we concur in the views expressed by Mr. Butler in the careful and judicious opinion furnished by him to the board prior to the commencement of the present proceedings.

Present — Davis, P. J., Brady and Barrett, JJ.

Judgment affirmed, with costs.